1

2

3

4

5

6                                                          *E-FILED - 3/31/08*

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   KEVIN O'CONNELL,                    )    No. C 01-20863 RMW (PR)
                                          )
12            Petitioner,                 )    ORDER DENYING PETITION
                                          )    FOR WRIT OF HABEAS
13       vs.                              )    CORPUS
                                          )
14   JOE McGRATH, Warden,                 )
                                          )
15            Respondent.                 )
                                          )
16   _____

17            Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254, challenging his state conviction.  Petitioner alleged

19   the following claims as grounds for federal habeas relief: (1) improper admission of a

20   statement obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966); (2) improper

21   admission of evidence that was obtained from a confession in violation of the "fruit of the

22   poisonous tree" doctrine; (3) improper jury instructions; (4) judicial misconduct in

23   making petitioner wear and display his shackles; (5) cruel and unusual punishment in a

24   disproportionate length of sentence; (6) improper sentence enhancement in using a 1980

25   robbery as a strike; and (7) improper sentence enhancement in using a 1981 assault as a

26   strike.  The court found the claims, liberally construed, cognizable under § 2254, and

27   ordered respondent to show cause why the petition should not be granted.  Respondent

28   has filed an answer, and petitioner has filed a traverse.

# I. __BACKGROUND__[1]

On February 28, 1998, a jury convicted petitioner of two counts of possessing and selling stolen property (Cal. Pen. Code § 496(a)).  Petitioner's trial was bifurcated as to the allegation that he suffered three prior serious felony convictions within the meaning of the Three Strikes Law (Cal. Pen. Code § 667(b)-(I)).  The jury found all three prior conviction allegations to be true.  On March 26, 1998, the court sentenced petitioner to a term of 25 years to life in state prison.

## A. __Factual Background__

### 1. __Underlying Offenses__

In March 1995, a house about five miles outside of Watsonville on Hecker Pass Road was burglarized ("Hecker House burglary").  One of the items taken from the house was a pendant that had a circle of fourteen diamonds surrounding a large and rare green gemstone called psavorite.  The pendant was unique and worth more than $13,000.  A gold "rhino" chain and 16-inch "omega" chain to which the pendant has been attached were also taken from the house.

On March 23, 1995, petitioner and his girlfriend Angela Desalvo ("DeSalvo") went to a pawnshop in Watsonville.  The petitioner and DeSalvo pawned a psavorite pendant and a "rhinoceros charm," which were both subsequently identified as the same pendant and bracelet taken in the Hecker Pass burglary.  Petitioner and DeSalvo received $55 for the pendant, although they had expected to receive more.  The two redeemed the pendant on April 1, 1995.

Petitioner subsequently sold the pendant for $250 or $350 to Colleen Brunetti ("Brunetti"), his former landlady.  After selling the pendant, petitioner was incarcerated in the Santa Clara County Jail ("SCCJ") on an unrelated matter from April 21 to June 22, 1995.  While incarcerated, petitioner telephoned Brunetti numerous times to seek the

---

[1] The summary of facts is excerpted from the opinion of the California Court of Appeal, Sixth District, __People v. O'Connell__, No. H018299, slip op. at 1-18 (Cal. Ct. App. May 26, 2000) (hereinafter "Slip Op.") (Resp't Ex. 10).

1  pendant's return.  Once released, petitioner conversed with Brunetti by telephone eight to

2  ten times and went to Brunetti's house four times to ask for the pendant.

3       Brunetti had misplaced the pendant and could not locate it.  She eventually found

4  the pendant and gave it to the police to stop petitioner's harassment.  When petitioner and

5  DeSalvo were arrested, DeSalvo was wearing a bracelet which had been taken in the

6  Hecker Pass burglary.

7            **2.      Petitioner's Statement to Officer Gombos**

8            Watsonville police officer Lance Stackhouse ("Stackhouse") arrested

9  petitioner around 5:30 p.m. on July 6, 1995, for being under the influence (Cal. Health &

10  Safety Code § 11550(a)).  Petitioner was transported to the Watsonville Police

11  Department where Stackhouse advised petitioner of his constitutional rights at about 6:30

12  p.m.  Petitioner stated that he understood his constitutional rights and that he did not wish

13  to talk.  Petitioner was subsequently transported to SCCJ.

14       Santa Cruz County Deputy Sheriff Frank Gombos ("Gombos") had been

15  investigating the burglary of a house on Littleway Lane ("Littleway Lane burglary"), the

16  Hecker Pass burglary, and the possession of stolen property taken in those burglaries.

17  Petitioner had been implicated in Gombos' investigation, and Gombos had seen a

18  photograph of petitioner.  Gombos was at SCCJ booking someone else when he

19  coincidentally noticed petitioner in a holding cell at 6:45 p.m.  Gombos confirmed

20  petitioner's identity with a detention officer, removed petitioner from the holding cell,

21  and took him to another room.  Gombos had no knowledge of the time or circumstances

22  of petitioner's earlier arrest, and he had not spoken with Stackhouse.  Gombos then

23  advised petitioner of his constitutional rights.  Petitioner acknowledged that he was aware

24  of his constitutional rights and said he was willing to talk to Gombos.  Gombos spoke

25  with petitioner for about ten minutes.  The interview was not tape-recorded.

26       During the interview, petitioner told Gombos that he and DeSalvo had gone to the

27  Littleway Lane address to try to rent a room but left after failing to find the man they were

28  trying to contact.  Petitioner stated that as he drove away, he saw property in his car which

he knew was stolen.  However, petitioner insisted that he had not stolen the property and blamed DeSalvo for taking it.

In the course of the interview, Gombos agreed that he would not arrest petitioner that night if petitioner made a truthful statement.  Petitioner was released just before midnight that night.  Petitioner's statement to Gombos was not introduced at trial.

### 3.    Petitioner's Statement to Officer Plageman

On July 12, 1995, Santa Cruz County Deputy Sheriff Fred Plageman ("Plageman") arrested petitioner for burglary, possession of stolen property, and being under the influence of a narcotic.  Plageman had spoken with Gombos about Gombos' prior interview with petitioner.

Petitioner admitted that he had consumed a half pint of alcohol in the several hours before his arrest.  Although he denied using heroin, petitioner had a fresh injection site on his leg.  Nevertheless, petitioner was coherent and appeared to understand and respond appropriately to questions and directions.  Plageman advised petitioner of his constitutional rights, and petitioner acknowledged that he understood his rights.

Plageman and petitioner discussed the Littleway Lane and Hecker Pass burglaries, as well as occasions when petitioner had pawned items and whether he had sold anything to Brunetti.  Petitioner denied selling Brunetti any jewelry.  When shown a photograph of the pendant, petitioner insisted he had never seen it before.  Eventually, petitioner stated he wanted to speak with an attorney.  After confirming that petitioner was requesting an attorney, the interview was concluded.

### B.    California State Court Proceedings

In July 1995, petitioner was charged by felony complaint with two counts of selling stolen property arising from the pawning and sale of the pendant.[2]  This complaint

---

[2] The complaint also charged petitioner with the Hecker Pass burglary and the Littleway Lane burglary.  In May 1997, the Hecker Pass burglary was dismissed by the prosecution for insufficiency of evidence.  In October 1997, the Littleway Lane burglary count was severed from the two selling stolen property counts, and was subsequently

1  alleged one prior conviction under California's Three Strikes Law (Cal. Pen. Code §§

2  667(b)-(I) and 1170.12)).  Throughout 1995, the information was amended several times

3  to revise both the time period of when the stolen property was sold and the number of

4  petitioner's prior convictions.

5      In September 1995, petitioner was released from custody to his mother so that he

6  could enter a substance abuse treatment program.  However, in late October 1995,

7  petitioner absconded from a substance abuse facility.  On December 18, 1995, a bench

8  warrant was issued for petitioner's arrest.  Petitioner was not found until March 1997.

9      On December 5, 1997, the information was amended to state that the time period

10  for the second count of selling stolen property was "between April 1, 1995 and May 10,

11  1995."  The information also stated that petitioner had suffered three prior convictions

12  within the meaning of California's Three Strikes Law (Cal. Pen. Code § 667(b)-(I)).

13      Petitioner made a pretrial motion to exclude the two statements he made to police

14  officers in July 1995.  Petitioner sought exclusion of his statement made to Gombos on

15  voluntariness grounds and sought exclusion of the statement made to Plageman on

16  Miranda grounds.  Five months before trial, an evidentiary hearing pursuant to California

17  Evidence Code § 402 was held before Judge Yonts, who was not the trial judge.  Both

18  parties stipulated that Judge Yonts' ruling would be binding at trial.  Judge Yonts denied

19  the motion.

20      Petitioner also made a pretrial motion that he be tried without any physical

21  restraints.  Judge Barton, the trial judge, denied the motion and ruled that petitioner

22  needed to be restrained.  Petitioner was given the option of being shackled or wearing a

23  reactive belt, and eventually chose to be shackled.

24      Petitioner's trial commenced on February 18, 1998.  Petitioner testified on his own

25  behalf that the pendant belonged to DeSalvo and that he did not know the pendant was

26  stolen.  He admitted that he possessed the pendant on two occasions: once at the

27

28  dismissed after petitioner was convicted of the two counts of selling stolen property.

pawnshop and again when he sold it to Brunetti.  Petitioner also admitted that he lied to the police in a post-arrest statement, but asserted that he did so because he was impaired by alcohol and heroin, believed he was being setup by the police, and distrusted the police officer.  On February 28, 1998, a jury convicted petitioner of two counts of possessing and selling stolen property (Cal. Pen. Code § 496(a)).

Petitioner's trial was bifurcated as to the allegations that he had suffered three prior serious felony convictions within the meaning of California's Three Strikes Law.  Petitioner also testified on his own behalf that the three prior convictions were not true.  The jury found all three prior conviction allegations to be true.

On March 26, 1998, the court sentenced petitioner to a term of 25 years to life for both counts of possessing and selling stolen property and stayed the sentence on the first count pursuant to California Penal Code § 654.  The court also imposed a restitution fine of $10,000.

On October 13, 1998, petitioner sought review of his conviction in the California Court of Appeal.  On May 26, 2000, the state appellate court confirmed the conviction but reduced the restitution fine to $2,500.  Petitioner then appealed to the California Supreme Court, which denied review on September 13, 2000.  Petitioner did not seek collateral review in the state courts.  Petitioner filed the instate federal habeas petition on September 13, 2001.

## II. DISCUSSION

### A. Standard of Review

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings.  Under AEDPA, a federal court cannot grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or an involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the

United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.  "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.  The "objectively unreasonable" standard does not equate to "clear error" because "[t]hese two standards . . . are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

A federal habeas court may grant the writ it if concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).  The court must presume correct any determination of a factual issue made by a state court unless petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

///

///

1    **B.  Analysis of Legal Claims**

2         **1.      Inadmissibility of Statement based on Violation of *Miranda***

3              Petitioner's first claim is that the incriminating statements made during the

4    Plageman interview were improperly admitted into evidence because they were obtained

5    in violation of Miranda.  Petitioner does not deny that he was properly notified of his

6    Miranda rights.  Rather, petitioner contends the following: (a) he did not waive his rights;

7    (b) his statements were not voluntary due to his intoxication and Plageman's deception,

8    threats, and promises of leniency; and (c) petitioner's multiple attempts to invoke his

9    rights were ignored.  After a hearing to determine the admissibility of petitioner's

10   statements, the state trial court held the statement admissible.  The state appellate court

11   upheld the trial court's determination.

12        **a.      Waiver**

13             Miranda requires that a person subjected to custodial interrogation be

14   advised that he has the right to remain silent, that statements made can be used against

15   him, that he has the right to counsel, and that he has the right to have counsel appointed.

16   These warnings must precede any custodial interrogation, which occurs whenever law

17   enforcement officers question a person after taking that person into custody or otherwise

18   significantly deprive a person of freedom of action.  See Miranda, 384 U.S. at 444.  Once

19   properly advised of his rights, an accused may waive them voluntarily, knowingly and

20   intelligently.  See id. at 475.  A valid waiver of Miranda rights depends upon the totality

21   of the circumstances, including the background, experience and conduct of the defendant.

22   See United States v. Bernard S., 795 F.2d 749, 751 (9th Cir. 1986).  The government

23   must prove waiver by a preponderance of the evidence.  See Colorado v. Connelly, 479

24   U.S. 157, 168-69 (1986); Lego v. Twomey, 404 U.S. 477, 488-89 (1972); Terrovona v.

25   Kincheloe, 912 F.2d 1176, 1180 (9th Cir. 1990).[3]

26             The waiver need not be express as long so long as the totality of the circumstances

27

28        [3] To solicit a waiver of Miranda rights, a police officer need neither use a waiver form nor ask
     explicitly whether the defendant intends to waive his rights.  See Terrovona, 912 F.2d at 1179.

1  indicates that the waiver was knowing and voluntary.  North Carolina v. Butler, 441 U.S.

2  369, 373 (1979); Juan H. v. Allen, 408 F.3d 1262, 1271 (9th Cir. 2005); see, e.g., United

3  States v. Younger, 398 F.3d 1179, 1186 (9th Cir. 2005) (finding implied waiver based on

4  evidence that after defendant was advised, but before questioning, he made a spontaneous

5  statement and responded to further questions without reference to counsel).  There is a

6  presumption against waiver.  United States v. Garibay, 143 F.3d 534, 536 (9th Cir. 1998).

7  To satisfy its burden, the government must introduce sufficient evidence to establish that

8  under the totality of the circumstances, the defendant was aware of "the nature of the right

9  being abandoned and the consequences of the decision to abandon it."  Moran v. Burbine,

10  475 U.S. 412, 421 (1986).

11       A showing that the defendant knew his rights generally is sufficient to establish

12  that he knowingly and intelligently waived them.  See, e.g., Paulino v. Castro, 371 F.3d

13  1083, 1086-87 (9th Cir. 2004) (statement that suspect understood his rights and wanted to

14  talk to officer sufficient to waive right to counsel); United States v. Parra Cazares, 121

15  F.3d 1241, 1244 (9th Cir. 1997) (recitation of rights in English and supervision of reading

16  in Spanish, accompanied by officer's confirming that defendant understood his rights,

17  sufficient to establish that defendant knew his rights and knowingly and intelligently

18  waived them); United States v. Rodriguez-Rodriguez, 364 F.3d 1142, 1146 (9th Cir.

19  2004) (suspect suffering from mild or moderate heroin withdrawal who was "coherent

20  and responsive" voluntarily waived his Miranda rights after they were read to him in

21  English and Spanish).  And although the burden is on the government to prove

22  voluntariness, a waiver cannot be held involuntary absent official compulsion or coercion.

23  See Connelly, 479 U.S. at 170; Parra Cazares, 121 F.3d at 1244; United States v. Leon

24  Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988).  See generally Derrick v. Peterson, 924

25  F.2d 813, 820-24 (9th Cir. 1990) (explaining waiver analysis in detail).

26       In petitioner's case, the California court cited both California Supreme Court and

27  United States Supreme Court precedent in determining whether petitioner waived his

28  Miranda rights.  In People v. Whitson, the California Supreme Court stated that "the

relinquishment of the right must have been voluntary in the sense that it was the product

of a free and deliberate choice rather than intimidation, coercion, or deception" and that

the waiver have been made "with a full awareness of both the nature of the right being

abandoned and the consequences of the decision to abandon it."  17 Cal. 4th 229, 247

(1998) (citing Moran, 475 U.S. at 421).  Moreover, a defendant waives his rights if he

responds to questioning after being informed of his rights.  People v. Sully, 53 Cal. 3d

1195, 1233 (1991); People v. Johnson, 70 Cal. 2d 541, 558 (1969), disapproved of on

other grounds, People v. DeVaughn, 18 Cal. 3d 889, 899 n.8 (1977).  Finally, the

California court of appeal cited North Carolina v. Butler and examined the particular facts

and circumstances of the case, including petitioner's background, experience and

conduct.  Because the California Court of Appeal used California Supreme Court

precedent which cited directly to Supreme Court authority, it cannot be said that the state

court's standard for evaluating whether petitioner waived his Miranda rights was contrary

to clearly established federal law as determined by the Supreme Court.  See 28 U.S.C. §

2254(d); Williams v. Taylor, 529 U.S. at 402-03.

Furthermore, the state court's decision was not an unreasonable application of

Supreme Court precedent.  The state court determined that petitioner was fully advised of

his rights, expressly acknowledged that he understood those rights, and continued to

converse with Plageman.  See Slip Op. at 20.  Moreover, the court determined that

petitioner's "many prior arrests, advisements of his rights and intelligent decisions to

exercise those rights on some occasions and waive them on other occasions coupled with

his obvious willingness to talk to Plageman established that he voluntarily responded to

Plageman's questions."  Id.; see Butler, 441 U.S. at 374-75.  In addition, the court

determined that Plageman did not coerce, deceive, or intimidate petitioner into waiving

his rights.  Finally, petitioner acknowledged at trial that he waived his rights: "[Plageman]

asked me if I waived my rights and talk to him... I went ahead and waived that right...".

(Resp't Ex. 3 at 5137, ll. 12-15.)  Petitioner's claim is without merit and is DENIED.

///

b.   **Voluntariness**

Petitioner claims that his statement to Plageman was not voluntary due to petitioner's intoxication and Plageman's deception, threats, and promises of leniency.

In determining whether a defendant's will was overborne and a statement was involuntary, the reviewing court must assess the totality of the circumstances surrounding the interrogation. See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). To determine voluntariness of a statement under Miranda, courts have considered the intelligence and education of the defendant, as well as the defendant's prior experience with police. See Reck v. Pate, 367 U.S. 433, 441 (1961) (court considered defendant's subnormal intelligence and lack of experience with police as factors in determining that statement was involuntary); Fare v. Michael C., 442 U.S. 707, 726 (1979) (court considered lack of evidence that defendant was of insufficient intelligence and defendant's considerable experience with the police to determine that defendant's statement was voluntary). Courts have also considered the nature of the interrogation to determine voluntariness of a statement made to police. See Ashcraft v. Tennessee, 322 U.S. 143, 149 (1944) (court determined that defendant's statement was involuntary due to the defendant being subjected to a thirty-six hour interrogation conducted by police officers that acted in relays).

The Supreme Court has not explicitly held that a defendant's impairment due to alcohol or drugs renders a statement involuntary. Rather, the Court has focused on whether there was police coercion. See Connelly, 479 U.S. at 170 (rejecting defendant's argument that a confession must be made of defendant's free will and upholding admissible defendant's confession even though he was mentally ill at the time of confession because the police did not coerce him to confess).

Moreover, the Supreme Court's broadly stated rule – that statements are involuntary if they are the product of any sort of threats or violence, direct or implied promises, or exertion of any improper influence – has not invalidated any statements

made under such circumstances.  Guerrero, 847 F.2d at 1366 ("This broadly-stated rule

has not been applied to invalidate, per se, all statements made by a suspect in response to

a promise made by law enforcement personnel."); Illinois v. Perkins, 496 U.S. 292, 297

(1990) ("Ploys to mislead a suspect to speak are not within Miranda's concerns."); Frazier

v. Cupp, 294 U.S. 731, 739 (1969) ("The questioning was of short duration, and

petitioner was a mature individual of normal intelligence.  The fact that the police

misrepresented the statements that Rawls had made is, while relevant, insufficient in our

view to make this otherwise voluntary confession inadmissible.").  Rather, "[t]he promise

must be sufficiently compelling to overbear the suspect's will in light of all the attendant

circumstances."  Guerrero, 847 F.3d at 1366.  As a result, the Ninth Circuit has held that

an interrogator's promise to inform the prosecutor about the suspect's cooperation and to

recommend leniency does not render a subsequent statement involuntary.  See id.; see

also States v. Coleman, 208 F.3d 786, 791 (9th Cir. 2000) (stating that agents' promise

that "[t]hey can tell the prosecutor to give [the defendant] little or no time" insufficient to

establish involuntariness).

    In petitioner's case, the California Court of Appeal stated that the prosecution

bore the burden of proving by the preponderance of the evidence the voluntariness of

petitioner's statement to Plageman.  See Slip Op. at 21.  Moreover, the state court

examined petitioner's background, experience, and conduct, as well as the totality of the

circumstances regarding petitioner's statement.  People v. Williams, 16 Cal. 4th 635, 661

(1997) ("[N]o single factor is dispositive in determining the voluntariness, but rather

courts consider the totality of the circumstances."); In re Shawn D., 20 Cal. App. 4th 200,

209 (1993) ("Characteristics of the accused which may be examined include the

accused's age, sophistication, prior experience with the criminal justice system and

emotional state.").  Because the state appellate court used both California Supreme Court

and Supreme Court authority in making its determination of the voluntariness of

petitioner's statement, the state court's standard for evaluating such voluntariness was not

contrary to clearly established federal law as determined by the Supreme Court.  See 28

1  U.S. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. at 402-03.

2       Furthermore, the California Court of Appeal's decision was not an unreasonable

3  application of Supreme Court precedent.  The record amply supports the state court's

4  determinations that: 1) petitioner was fully cognizant of the consequences of his statement

5  when he made them, even if he was intoxicated; 2) Plageman's slightly deceptive

6  attempts to convince petitioner that there was evidence of his involvement in the two

7  burglaries were not successful, since petitioner denied knowledge of and involvement in

8  the burglaries; and 3) Plageman did not make any threats or promises of leniency.

9       Petitioner makes much of the fact that he was intoxicated and Plageman took

10  advantage of that intoxication.  However, the voluntariness of petitioner's statement does

11  not depend on petitioner's intoxication or Plageman's use of that intoxication to his

12  advantage.  Rather, the voluntariness depends on whether Plageman coerced petitioner

13  into making a statement.  <u>See</u> <u>Connelly</u>, 479 U.S. at 167, 170.  Moreover, petitioner

14  testified at trial that even though he was intoxicated, he still understood what was

15  happening: "Q:...The first thing that you told us is that you were under the influence, and

16  so you kind of didn't know what was going on; is that true?  [Petitioner]: I was somewhat

17  impaired, but I had a gist of what was happening."  (Resp't Ex. 3 at 5142, ll. 8-12.)

18       In addition, Plageman's deception did not coerce petitioner into making a

19  statement.  Plageman told petitioner that stolen items were found in his car, that witnesses

20  placed him at the house of one burglary, and that fingerprints were found at the house.

21  (Resp't Ex. 2 at 63-4, 66 and 79.)  However, petitioner denied all knowledge of the

22  burglaries and stolen items.  <u>Id.</u>  Thus, Plageman's deception did not cause petitioner to

23  make any incriminating statements.

24       Petitioner's claim that Plageman made threats and promises of leniency is also

25  groundless.  Petitioner argues that Plageman initially offered medical assistance if

26  petitioner cooperated, citing the following:

27       [Plageman]: So that's why you're sitting here today in a set of
        handcuffs.  I know it's not very pleasant and I know you're not
28       feeling well, um, I think if we better talk, we'll get some of the stuff
        cleared up.  And it would be better, um...

1  [Petitioner]: That's fine with me, I....
2  [Plageman]: ...better figure out what's going on.  Okay, if you need some help, we'd better get you some help, you know, that kind of thing.  Um... you've been arrested before.
3  [Petitioner]: Yes, _____ Before.

4  (Resp't Ex. 2 at 62-3.)  However, nothing in this discussion indicates a promise of

5  medical attention in return for cooperation, nor does the discussion indicate any coercion.

6  Petitioner further alleges that Plageman made continual promises that petitioner's

7  cooperation would make things better for him.  However, the record does not support

8  petitioner's claims.  (See, e.g., Resp't Ex. 2 at 69 ([Plageman]: Okay.  Well actually it's

9  real important that you talk to me in some respects because, um, like, you know, like I

10  said if you want to clear this up this is the chance now to do it because the thing is, is that,

11  um, and I , I have a curiosity too."); id. at 78 ("[Plageman]: ...That's why I'm here and

12  that's why I'm talking to you, Kevin, because I'll tell you what.  There are two sides to

13  every story.  Okay? And I don't want the world to creep up and try to pick on you.  You

14  know what I mean.").)  Plageman made no promises that would arise to the level of

15  coercion.  See Guerrero, 847 F.3d at 1366; Coleman, 208 F.3d at 791.  Petitioner's claim

16  is without merit and is DENIED.

17                    c.    **Invocation of Miranda Rights**

18                    Petitioner claims that he invoked his Miranda rights several times

19  during the interview with Plageman but was ignored each time.

20        The Supreme Court has clearly stated that "[i]f the individual indicates in any

21  manner, at any time prior to or during questioning, that he wishes to remain silent, the

22  interrogation must cease."  Miranda, 384 U.S. at 473-74; United States v. Wallace, 484

23  F.3d 1464, 1475 (9th Cir. 1988); United States v. Lopez-Diaz, 630 F.2d 661, 664 (9th Cir.

24  1980).  However, the exercise of the right to remain silent does not necessarily preclude

25  all further questioning.  Rather, the Supreme Court has concluded that "the admissibility

26  of statements obtained after the person in custody has decided to remain silent depends

27  under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'"

28  Michigan v. Mosley, 423 U.S. 96 (1975); see United States v. Garcia-Cruz, 978 F.2d 537

1   (9th Cir. 1992); Lopez-Diaz, 630 F.2d at 664 ("The Supreme Court has rejected a literal

2   interpretation of Miranda, however, holding that the exercise of the right to remain silent

3   does not preclude all further questioning.").

4        Moreover, some federal circuit courts of appeals have held that a "suspect may

5   waive his right to remain silent selectively, waiving it with regard to some, but fewer than

6   all, topics of discussion."  Garcia-Cruz, 978 F.2d at 542; United States v. Mikell, 102

7   F.3d 470, 477 (11th Cir. 1996) (holding that "a suspect's refusal to answer certain

8   questions is not tantamount to the invocation, either equivocal or unequivocal, of the

9   constitutional right to remain silent and that questioning may continue until the suspect

10  articulates in some manner that he wishes the questioning to cease."); United States v.

11  Johnson, 56 F.3dd 947, 955 (5th Cir. 1996) ("To adequately invoke this right and

12  effectively cut off questioning, a suspect must indicate a clear, consistent expression of a

13  desire to remain silent.") (internal quotation marks omitted).  In addition, a suspect also

14  may revoke selectively a previously effected comprehensive waiver.  See Garcia-Cruz,

15  978 F.2d at 542; see United States v. Lorenzo, 570 F.2d 294, 297-98 (9th Cir. 1978).

16       The California Supreme Court has also stated that police officers must cease

17  questioning a suspect who exercises the right to cut off the interrogation.  See People v.

18  Musselwhite, 17 Cal. 4th 1216, 1238 (1998); see In re Joe R., 27 Cal. 3d 496, 515-16

19  (1980).  In doing so, the California Supreme Court relied upon Miranda v. Arizona.  See

20  Musselwhite, 17 Cal. 4th at 1238; Joe R., 27 Cal. 3d at 515.  The state high court has

21  further stated that "[w]hether the suspect has indeed invoked that right, however, is a

22  question of fact to be decided in the light of all the circumstances," that "[a] desire to halt

23  the interrogation may be indicated in a variety of ways," and that "the words used must be

24  construed in context."  Musselwhite, 17 Cal. 4th at 1238 (internal citations and quotation

25  marks omitted); see Joe R., 27 Cal. 3d at 515-16.  Moreover, the court has held that a

26  defendant may indicate an unwillingness to discuss certain subjects without manifesting a

27  desire to terminate an interrogation already in progress."  People v. Silva, 45 Cal. 3d 604,

28  629-30 (1988) (internal quotation mark omitted).  As a result, the California Supreme

1  Court has held that a defendant has not invoked his right to remain silent if he states he

2  does not wish to continue a line of questioning yet continues to answer the question or

3  converse with the interrogation.  See Musselwhite, 17 Cal. 4th at 1239 (holding that

4  defendant did not invoke his right to remain silent after he stated "I don't want to talk

5  about this" yet continued to converse with the police officer); Silva, 45 Cal. 3d 604 at

6  629-30 (holding that defendant's claim that his statement "I really don't want to talk

7  about that" was not an invocation of his right to remain silent as to any further

8  questioning); Joe R., 27 Cal 3.d at 516 (holding that juvenile defendant's statement that

9  "That's all I have to say", could have reasonably been inferred to meant the defendant

10  was saying that "That's my story, and I'll stick with it" rather than an invocation of his

11  right to remain silent.).

12         California's procedure for evaluating whether a defendant has invoked his right to

13  remain silent parallels the Supreme Court's decision in Miranda and Mosley.  Thus,

14  California's standard for analyzing a defendant's invocation of his Miranda rights is not

15  contrary to or an unreasonable applicable of clearly established federal law as determined

16  by the Supreme Court.  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. at 402-03.

17         The state court's decision was not an unreasonable application of Supreme Court

18  precedent.  The state court determined that petitioner's assertions that he either had

19  nothing further to say or that he would rather not talk about a certain line of questioning

20  were not attempts to invoke his right to silence.  (See e.g., Resp't Ex. 2 at 66

21  ("[Petitioner]: I didn't take anything and I know that.  [Plageman]: Okay.  [Petitioner]:

22  That's all I need to say.  [Plageman]: Okay.  [Petitioner]: I haven't taken anything."); id.

23  ("[Petitioner]: Three people saw me do this is what I was told, no, I didn't do no such

24  thing.  [Plageman]: Okay.  [Petitioner]: And that's about all I need to say."); id. at 67

25  ("[Petitioner]: This is being blown out of proportion here.  [Plageman]: Okay. Well then

26  your [sic] clearing this up.  [Petitioner]: I am. All I know."); id., at 68 ("[Plageman]: Um,

27  describe [the jade ring] to me, what, what's it look like?  [Petitioner]: What... I've got

28  nothing more to say.  I really don't.  [Plageman]: Why's that? [Petitioner]: Because

there's nothing to say here.  You're arresting me regardless, you know.  I could sit here and tell you, you know, it doesn't matter.  I tell you I haven't done anything, tell me differently."); id. at 70-71 ("[Petitioner]: It was bought for me, and that could be proven.  I'd rather not talk about it. [Plageman]: Okay. What.... [Petitioner]: Well you're gonna tell them what I'm telling you about it... [Plageman]: No, I'm not.").)  Plageman also testified on cross-examination that he considered petitioner's assertion that he had nothing else to say to mean that petitioner had nothing further to add to what he had already said rather than his wish to terminate the interview.  (See Resp't Ex. 3 at 5081, ll. 19-21.)  Finally, when petitioner asked to speak to an attorney, Plageman verified that petitioner was requesting an attorney and concluded the interview.  Thus, the court did not unreasonably determine that petitioner's assertions indicated petitioner had given a complete statement on that topic or that he was reluctant to further discuss a particular topic rather than an invocation of his rights.  Accordingly, petitioner's claim is without merit and is DENIED.

## 2.    Fruit of the Poisonous Tree Doctrine

Petitioner's next claim is that the Gombos interview was illegal because it occurred after petitioner had invoked his right to remain silent to Stackhouse and because it was the product of Gombos' offer of leniency.  Because Plageman had spoken to Gombos before interviewing petitioner, petitioner argues that his statements to Plageman are the tainted fruits of the Gombos interview and that the statement to Plageman should have been suppressed.

The California Supreme Court has stated that "[i]n seeking to exclude evidence not directly obtained by illegal conduct, the defendant bears the burden of making a prima facie case that such evidence was tainted by – i.e., causally linked to – the primary illegality."  People v. Beardslee, 53 Cal. 3d 68, 108 (1991) (internal citations and quotation marks omitted); People v. Williams, 45 Cal. 3d 1268, 1300 (1988).  Moreover, the defendant "must show more than that the challenged evidence 'would not have come to light *but for* the illegal actions of the police'; rather, he must establish that it 'has been come at by *exploitation* of that illegality....'"  Beardslee, 53 Cal. 3d at 108.  "If the

1  defendant makes this showing, the burden shifts to the prosecution to prove that the taint

2  has been 'purged' and hence that the evidence is admissible in spite of the primary

3  illegality." Id.

4        In the present case, the state appellate court relied on Beardslee to reject

5  petitioner's claim. See Slip Op. at 24-25. The state court held that petitioner failed to

6  demonstrate a prima facie case that the Plageman interview was tainted by the alleged

7  illegalities of the Gombos interview. Moreover, the court held that the prosecution met

8  its burden of establishing that petitioner's statements to Plageman were not tainted by any

9  illegalities associated with petitioner's statement to Gombos.

10        Petitioner's claim is without merit. The state appellate court, in relying on

11  Beardslee, did not use a test that is contrary to or an unreasonable application of Supreme

12  Court precedent. Cf. Alderman v. United States, 394 U.S. 165, 183 (1969) ("The United

13  States concedes that when an illegal search has come to light, it has the ultimate burden of

14  persuasion to show that its evidence is untainted. But at the same time [defendants]

15  acknowledge that they must go forward with specific evidence demonstrating taint.").

16  Moreover, the state court was not unreasonable in holding that the prosecution had met its

17  burden in establishing that petitioner's statement to Plageman were not tainted by an

18  illegalities associated with petitioner's statement to Gombos. The interviews were

19  separated by six days, took place in different locations, and were conducted by different

20  officers. See Oregon v. Elstad, 470 U.S. 298, 310 (1985) ("When a prior statement is

21  actually coerced, the time that passes between confessions, the change in place of

22  interrogations, and the change in identity of the interrogators all bear on whether the

23  coercion has carried over into the second confession.").[4] Accordingly, the state court's

24  rejection of this claim was neither contrary to, nor an unreasonable application of,

25

---

26        [4] Although petitioner contested the constitutionality of the Gombos interview, the state
27  court did not evaluate whether the Gombos interview violated petitioner's constitutional
    rights. Rather, it assumed arguendo that the admissions were the fruit of a Miranda
28  violation or an illicit offer of leniency by the interviewing officer.

1  Supreme Court precedent.  <u>See</u> 28 U.S.C. § 2254(d).  Petitioner's claim is DENIED.

2     **3.**    **<u>Jury Instructions</u>**

3         Petitioner challenges the trial court's instruction to the jury regarding the

4  voluntariness of petitioner's statement to Plageman.  The trial court instructed the jury

5  that "[t]he interview of the defendant by Mr. Plageman did not violate [petitioner's]

6  rights, and it is therefore not an issue before you, the jury."  (Resp't Ex. 3 at 5300, ll. 13-

7  15.)  Petitioner argues that the jury would have interpreted the instructions as foreclosing

8  any evaluation of the reliability of the statements made, and thus the instructions violated

9  his constitutional rights to have the jury consider the credibility of the statement under

10  <u>Crane v. Kentucky</u>, 476 U.S. 683 (1986).

11       The Supreme Court has well established that "the Constitution guarantees criminal

12  defendants a meaningful opportunity to present a complete defense."  <u>Crane</u>, 476 U.S. at

13  690.  In <u>Crane</u>, the state court precluded the defendant from attacking the credibility of

14  his confession because it believed such an attack went towards the voluntariness of the

15  confession.  <u>Id.</u> at 685-86.  Because the state court had already determined that the

16  confession was voluntary, it saw no need to examine the confession's credibility.  <u>Id.</u>  The

17  Supreme Court concluded that the manner in which a confession is taken is relevant to

18  both the legal question of voluntariness and the factual issue of a defendant's guilt or

19  innocence.  <u>Id.</u> at 688-89.  As a result, the Court held that although the trial court may rule

20  on the legal question of whether an officer's actions during the interrogation violated the

21  defendant's constitutional rights, such as voluntariness, the state may not exclude

22  evidence pertaining to the manner, circumstances, or content of the interview and thereby

23  prevent the defendant from attacking the reliability or credibility of the statement.  <u>Id.</u> at

24  689-91.

25       In determining whether a jury instruction violates the defendant's constitutional

26  rights, the Supreme Court has also clearly established that "the proper inquiry in such a

27  case is whether there is a reasonable likelihood that the jury has applied the challenged

28  instruction in a way that prevents the consideration of constitutionally relevant evidence."

1  Boyde v. California, 494 U.S. 370, 380 (1990); see Estelle v. McGuire, 502 U.S. 62, 72

2  (1991); Spivey v. Rocha, 194 F.3d 971, 976 (9th Cir. 1999); Masoner v. Thurman, 996

3  F.2d 1003, 1006 (9th Cir. 1993).  Moreover, the only question is "'whether the ailing

4  instruction itself so infected the entire trial that the resulting conviction violates due

5  process.'"  Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).

6  The Supreme Court has also stated that "[i]t is well established that the instruction 'may

7  not be judged in artificial isolation' but must be considered in the context of the

8  instructions as a whole and the trial record.  Id. (quoting Cupp, 414 U.S. at 147).

9      California law for evaluating jury instructions in violation of defendant's

10  constitutional rights follow Supreme Court precedent.  In People v. Kelly, the California

11  Supreme Court stated, "We now examine the instructions to determined whether this law

12  was correctly conveyed to the jury.  Once we have ascertained the relevant law, we

13  determine the meaning of the instructions in this regard.  Here the question is whether

14  there is a 'reasonable likelihood' that the jury understood the charge as the defendant

15  asserts."  1 Cal. 4th 495, 525 (quoting, among other cases, Estelle, 502 U.S. 62 and

16  Boyde, 494 U.S. 370.  The California Supreme Court further stated that "[i]n addressing

17  this question, we consider the specific language under challenge and, if necessary, the

18  charge in its entirety."  Id. at 525.  Furthermore, in People v. Clair, the California

19  Supreme Court stated:

20      Early in its present term, the United States Supreme Court embraced the
      "reasonable likelihood" standard for reviewing ambiguous instructions
21      under the United States Constitution, inquiring whether there is a
      reasonable likelihood that the jury misconstrued or misapplied the words in
22      violation of that document.  (Estelle v. McGquire, supra, U.S. at 6. [116
      L.Ed.2d at p. 399, 112 S.Ct. at p. 482]).  We have already followed the
23      court in this regard.  (See People v. Kelly (1992) 1 Cal.4th 494, 525 [3
      Cal.Rptr.2d 677, 822 P.2d 385].)  We believe that the new test is proper for
24      examining instructions under California law.

25  2 Cal. 4th 629, 633 (1992).  Thus, California has adopted and applied Supreme Court

26  precedent in determining whether a jury instruction violates the defendant's constitutional

27  rights.

28      In petitioner's case, the California Court of Appeal relied upon Boyde, Clair, and

1    Kelly to determine that the trial court's instruction did not violate petitioner's rights.

2    First, the court parsed the jury instructions and found that the second clause of the juror

3    instruction was subject to two different interpretations.  The second clause "told that jury

4    that 'it' was not an issue before the jury.  Obviously, this 'it' referred back to something

5    in the first clause.  The only subjects to which this 'it' could have referred were (1) the

6    interview itself or (2) the defendant's rights or the violation of defendant's rights."  See

7    Slip Op. at 28-29.  Next, the court determined that it was "not reasonably likely that the

8    jury would have understood the court's instructions to tell it that the interview itself was

9    not an issue before it."  Id. at 29; see Boyde, 494 U.S. at 380; Clair, 2 Cal. 4th at 633;

10   Kelly, 1 Cal. 4th at 525.  The court examined the context of the instructions in the trial,

11   stating that petitioner's statements to Plageman were an essential part of both the

12   prosecution and defense cases, as both had introduced evidence about the interview and

13   argued to the jury regarding the interview.  See Slip Op. at 29.  As a result, the court of

14   appeal concluded that "[n]o reasonable juror could have understood this clause to tell him

15   or her to ignore the interview."  Id.  Rather, the court determined that a reasonable juror

16   would have understood that the clause "referred to the violation of defendant's rights and

17   was telling the juror not to consider whether the interview had violated defendant's right.

18   Such a reasonable juror would therefore not have misunderstood the instruction to

19   preclude consideration of the interview itself for its manner or circumstances."  Id.

20        The California Court of Appeal did not use a rule that is contrary to, or involved an

21   unreasonable application of, clearly established federal law, as determined by the

22   Supreme Court in determining whether a jury instruction violated the defendant's

23   constitutional rights.  Therefore, it cannot be said that their rejection of this claim was

24   contrary to, or an unreasonable application of, Supreme Court precedent.  See 28 U.S.C. §

25   2254(d).  Petitioner's claim is without merit and is DENIED.

26        **4.       Judicial misconduct in making petitioner wear and display his shackles**

27        Petitioner's next claim is that the trial court violated his constitutional rights

28   by having him shackled during the trial in full view of the jury.  Due to petitioner's

1    history of violent behavior in and out of court, including an assault on an officer, the trial

2    court decided physical restraints were necessary.  Petitioner nonetheless argues that there

3    was insufficient cause to use physical restraints, which had a prejudicial impact on the

4    jury's verdict.  Petitioner also claims that during the bifurcated trial on his prior

5    convictions, the trial court violated his constitutional rights by forcing him to leave the

6    witness stand and walk with his shackles in full view of the jury.

7            a.    **Wearing Shackles during Trial on Substantive Charges**

8            The Fifth and Fourteenth Amendments prohibit the use of physical

9    restraints visible to the jury absent a trial court determination, in the exercise of its

10   discretion, that restraints are justified by a state interest specific to a particular trial.  Deck

11   v. Missouri, 544 U.S. 622, 2012 ( 2005); Rhoden v. Rowland, 172 F.3d 633, 636 (9th Cir.

12   1999) ("Rhoden II"; Spain v. Rushen, 883 F.2d 712, 716 (9th Cir. 1989).  To assess

13   whether the shackles violated petitioner's right to due process, the trial court must analyze

14   the security risks posed by the defendant and consider less restrictive alternatives before

15   permitting a defendant to be restrained.  Rhoden II, 172 F.3d at 636; Jones v. Meyers, 899

16   F.2d 883, 885 (9th Cir. 1990).  But see Deck, 544 U.S. at 633 (not including "least

17   restrictive alternative" in statement of circumstances where judge may allow shackling).

18       In considering less restrictive alternatives to shackling, the trial court should take

19   into account that "(1) shackles may reverse the presumption of innocence by causing jury

20   prejudice; (2) shackles may impair the defendant's mental faculties; (3) shackles may

21   impede communication between the defendant and his counsel; (4) shackles may detract

22   from the decorum of the judicial proceeding; (5) shackles may cause pain to the

23   defendant."  Id.; see also Deck,  544 U.S. at 631 (concluding that reasons for shackling

24   rule are to (1)  preserve the presumption of innocence; (2) avoid an impediment to

25   meaningful assistance of counsel; and (3) maintain a dignified judicial process).  The trial

26   court "'must weigh the benefits and [these] burdens of shackling against other possible

27   alternatives.'"  Castillo v. Stainer, 983 F.2d 145, 147 (9th Cir. 1992) (quoting Spain, 883

28   F.2d at 721) (sic in original), amended, 997 F.2d 669 (9th Cir. 1993).  The trial court need

not "conduct a hearing and make findings before ordering that a defendant be shackled," however.  Jones, 899 F.2d at 886.

Shackling may be justified as a last resort, in cases of extreme need or in cases urgently demanding that action.  See Wilson v. McCarthy, 770 F.2d 1482, 1485 (9th Cir. 1985); Tyars v. Finner, 709 F.2d 1274, 1284 (9th Cir. 1983).  Shackling therefore is proper where there is a serious threat of escape or danger to those in and around the courtroom, see Morgan v. Bunnell, 24 F.3d 49, 51 (9th Cir. 1994); Hamilton v. Vasquez, 882 F.2d 1469, 1471 (9th Cir. 1989); Loux, 389 F.2d at 919, or where disruption in the courtroom is likely in the absence of shackles, see Wilson, 770 F.2d at 1485; see also Stewart v. Corbin, 850 F.2d 492, 497 (9th Cir. 1988) (shackling was supported by evidence of prior escapes from immediate physical custody of law enforcement officers, once while handcuffed, and by defendant's disruptive behavior during trial; gagging was supported by evidence that he violated court order not to mention certain subjects in front of the jury; and gagging did not violate right of self-representation, as defendant was protected by appointment of counsel), cert. denied, 490 U.S. 1016 (1989).  It is improper, however, where a compelling need is not established, less restrictive alternatives are not pursued or where the harms were not assessed.  See Rhoden v. Rowland, 10 F.3d 1457, 1459 (9th Cir. 1993) ("Rhoden I"); see, e.g., Packer v. Hill, 291 F.3d 569, 583 (9th Cir. 2002) (holding that state trial judge erred by placing defendant in leg brace, where the only evidence of security risk was unsworn testimony that potential witness planned to do "stuff" while in town to testify, although error did not prejudice defendant); Tyars v. Finner, 709 F.2d 1274, 1284 (9th Cir. 1983) (shackling defendant in civil commitment proceeding without any demonstration that lesser restraints would have been ineffective or impractical constituted violation of due process).

There is a consensus between federal and California courts that a shackled defendant, whether the shackling is unconstitutional or not, is not prejudiced when the jury is unaware of the shackling and when the defendant can still participant in his defense.  See e.g., Ghent v. Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002) ("In order for

a defendant to prevail on a claim of this nature, a court must find that the defendant was indeed physically restrained in the presence of the jury, that the shackling was seen by the jury, and that the physical restraint was not justified by state interests."); Castillo v. Stainer, 983 F.2d 145, 149 (9th Cir. 1992) (finding harmless error when defendant's unconstitutional shackling was "invisible" to the jury), amended by 997 F.2d 669 (9th Cir. 1993); People v. Cox, 809 P.2d 351, 367 (Cal. 1991) (holding that defendant's unconstitutional shackling was harmless because the jury was not aware of the restraints); People v. Tuilaepa, 842 P.2d 1142, 1150 (Cal. Ct. App. 1992) ("We have consistently found any unjustified or unadmonished shackling harmless where there is no evidence it was seen by the jury.").

The California Court of Appeal reviewed petitioner's criminal history, and noted the following: 1) in 1995, petitioner had attempted to commit suicide by slashing his wrists with a razor while incarcerated in county jail; 2) in 1995 petitioner, who had been released in his mother's custody, fled from a substance abuse facility; and 3) in December 1995, a bench warrant issued for petitioner's arrest and he was not found until March 1997. See Slip Op. at 43-44. Petitioner also had prior convictions for assault and strong-armed robbery. The state appellate court further noted that petitioner's behavior while incarcerated in County jail was described by the County as "violently assaultive":

> [Petitioner's] incarceration history showed that he repeatedly threatened and spit on jail personnel, struggled with detention officers and "bit" one of them, tried to strike a detention officer, "smeared feces on himself," threatened another inmate, fought with another inmate and disregarded jail rules. The jail commander declared: "[PETITIONER] poses a serious threat to staff and other inmates. That threat exists whenever [PETITIONER] is moved about the facility or must be removed from his cell. [PETITIONER] now must be moved by at least two officers and be handcuffed and chained.

Id. at 44.

The state appellate court also reviewed petitioner's disruptive behavior in court and in jail. On two separate occasions petitioner behaved in a disruptive manner during hearings before the trial court for the substantive charges, ignoring the admonishments of the court and advice of counsel. See id. at 44-5. Furthermore, when petitioner repeatedly

1  complained about being denied access to the law library, the prosecutor noted that

2  petitioner's law library privileges had been taken away on some occasions due to his

3  "disciplinary problem." Id. at 45.  The trial court was also concerned with petitioner's

4  then pending charges for felony assault on a custodial officer and battery on a custodial

5  officer for misconduct in the County Jail while awaiting trial on the current offenses.  Id.

6       Here, it cannot be said that the shackles used during trial were not justified by state

7  interests.  The trial court reasonably determined that petitioner's "violent misconduct in

8  jail, his extensive criminal history, his prior convictions for violent crimes and his

9  repeated disruptive conduct in the courtroom demonstrated that there was a significant

10  risk that [petitioner] would disrupt the proceedings if he was not restrained." Id. at 47;

11  accord Morgan, 24 F.3d at 51 (demonstrated propensity for violence reason enough to

12  justify shackling as necessary precaution).  The trial court also properly pursued less

13  restrictive alternatives and took reasonable measures to protect petitioner's presumption

14  of innocence by "shackling [petitioner] in his street clothes to the chair and then hanging

15  a sweater or coat over it so the jury cannot see it," by excusing petitioner from standing

16  unless instructed by the court, and by excusing the jury when petitioner walked to and

17  from the witness stand. Id. at 47-8; accord Morgan, 24 F.3d at 51-52 (record reflects that

18  trial court assessed and utilized less restrictive alternatives and took adequate precautions

19  to minimize effects of shackles where court ordered the removal of handcuffs during trial

20  and excused the jury from courtroom when defendant walked to stand wearing leg irons).

21  In sum, the trial court reasonably concluded that shackles were justified under the

22  circumstances.  See 28 U.S.C. § 2254(d); Morgan, 24 F.3d at 51-52.

23       Petitioner argues that the jury was aware of his shackles during the trial on the

24  substantive charges and this resulted in prejudice.  During his sentencing hearing,

25  petitioner stated, "Throughout the trial, each time I moved, the chain slapped against the

26  chair, and the jury would look at me... A few jurors looked at me with a look of what I

27  call fear and disgust.  I can read it no other way."  (Resp't Ex. 3 at 5781, ll. 18-23.)

28  However, the state court of appeal found that "[t]he record here rebuts any inference that

1    the jury was aware of the physical restraints during the trial on the substantive charges.

2    See Slip Op. at 51.  The state court found that at his counsel's request, petitioner was

3    moved to the witness stand outside of the jury's presence to that the jury would not

4    become aware of the physical restrains.  Id.  (See also Resp't Ex. 3 at 5128-29, ll. 25-26,

5    1-3.)  Moreover, during the jury instruction conference, trial counsel conceded that the

6    jury had not become aware of the physical restrains when he agreed that the jury should

7    not be instructed on physical restraints.  Id. at 52.  (See also Resp't Ex. 3 at 5273, ll. 118-

8    22 ("THE COURT: 1.04, which is the defendant physically restrained, cautionary

9    instruction, I don't believe that applies at this point.  There's been an indication on both

10   sides that's not going to be given. [Petitioner's defense counsel]: Correct.").)  Finally, the

11   court of appeals noted that the prosecutor made a contrary statement in which he

12   characterized petitioner's claim made during the sentencing hearing as a "complete

13   fabrication" and stated that there was nothing in the record that reflected the jurors had

14   noticed petitioner's shackles.  Id. at 52.  (See also Resp't Ex. 3 at 5802, ll. 1-9.)  Other

15   than his conclusory allegations that the jury was aware of his shackles which prejudiced

16   him, petitioner sets forth no evidence in his petition to support this claim.  Since the

17   shackling was justified by state interests and petitioner was able to participate in his own

18   defense, there is no merit to petitioner's claim.  See Ghent, 279 F.3d at 1132; see Castillo,

19   983 F.2d at 149.

20        The state court's rejection of this claim was not contrary to or an unreasonable

21   application of clearly established Supreme Court precedent.  See 28 U.S. § 2254(d).  Nor

22   was the state court's decision based on an unreasonable determination of the facts in light

23   of the evidence presented in state court.  See 28 U.S.C. § 2254(d)(2).  Petitioner's claim is

24   without merit and DENIED.

25        **b.**     **Wearing Shackles during Trial on Prior Conviction Charges**

26             Petitioner next claim is that he suffered prejudice during the

27   bifurcated trial for his prior conviction charges when he was forced to step down from

28   and carry his chair from the witness stand in the presence of the jury, revealing to them

1   that he was in handcuffs.  During jury instructions, the trial court instructed the jury that

2   they were not to consider the petitioner's physical restraints for any purpose, especially

3   with respect to the issue of guilt.

4       For the same reasons petitioner was shackled during his trial on the substantive

5   charges, petitioner was shackled for the bifurcated trial on the prior conviction charges.  It

6   cannot be said that shackling petitioner during the bifurcated trial on the prior conviction

7   charges were not justified by the same state interests.  See *supra* at 25.  Therefore, the

8   trial court reasonably concluded that shackles were justified under the circumstances.  See

9   28 U.S.C. § 2254(d); Morgan, 24 F.3d at 51-52.

10      During petitioner's trial on the prior conviction charges, petitioner testified on his

11  own behalf.  Prior to petitioner taking the witness stand, the trial court admonished

12  petitioner several times that he was only to testify as to whether his prior convictions were

13  true and that he was not to mention that this was a three strikes case.  Petitioner was

14  moved to the witness stand outside the jury's presence so that the jury would not become

15  aware of the physical restraints.  While on the stand, petitioner admitted that he pleaded

16  guilty to the robbery charge (Resp't Ex. 3 at 5571, ll. 19-25), as well as the assault count

17  and the great bodily injury allegation, (id. at 5574, ll. 12-16).  Petitioner also admitted that

18  a 1982 residential burglary allegation was true.  (Id. at 5576, ll. 14-15.)  During his

19  testimony, petitioner attempted to testify about the underlying facts behind his prior

20  convictions.  Each time, the trial court warned petitioner that he was not to stray from

21  testimony regarding whether his prior allegations were true.

22      Towards the end of his testimony, petitioner made the jury aware that his was a

23  three strikes case despite the admonitions from the court that he was not to do so.  (Resp't

24  Ex. 3 at 5578-78, ll. 18-26, 1-2.)  Because petitioner continued to speak, the trial court

25  ordered him to step down and carry his chair from the witness stand.  (Id. at 5578, ll.9.)

26  The trial court repeated the order after petitioner replied that he could not do so because

27  he was handcuffed.  (Id. at ll. 10-12.)

28      Because the jury had become aware of petitioner's physical restraints, the trial

1    court gave the following jury instruction:

2         The fact that physical restraints have been placed on the defendant must not
         be considered by you for any purpose.  They are not evidence of guilt, and
3         must not be considered by you as evidence that he is more likely to be guilty
         than not.  You must not speculate as to why restraints have been used.  In
4         determining this issue, disregard this matter entirely.

5    (Id. at 5582, ll. 16-22.)

6         Finally, during sentencing, in addition to stating that the jury was aware of his

7    shackling, petitioner stated that the reason for his outburst regarding the three strikes

8    issue was because, "[l]egally, [he] couldn't contest the prior convictions.  It was obvious

9    to [him] that [he] couldn't.  The jury had no choice but to validate the prior convictions."

10   (Id. at 5780, ll. 20-22.)

11        The record reveals that petitioner admitted as true that he suffered prior

12   convictions and admitted that it was obvious to him that the jury had no choice but to

13   validate the prior convictions – even before they were aware that he was shackled.  As a

14   result, the California court of appeals found that "it was not possible that the challenged

15   event could have had any impact on the jury's findings on the prior conviction

16   allegations."  Slip Op. at 88.  Consequently, the state court's determination that petitioner

17   was not prejudiced even though the jury saw his shackles was not "based on an

18   unreasonable determination of the facts in light of the evidence presented in the State

19   court proceeding."  28 U.S.C. § 2254(d)(2).  Petitioner's claim is DENIED.

20        **5.    Cruel and unusual punishment in a disproportionate length of sentence**

21             Petitioner's next claim is that his sentence of 25 years to life in state prison

22   amounts to cruel and unusual punishment, in violation of his rights under the Eighth

23   Amendment.  Respondents in their answer requested this claim be stayed pending

24   resolution by the United States Supreme Court of a similar claim in Lockyer v. Andrade,

25   538 U.S. 63, 72 (2003).  Since filing their answer, Lockyer has been decided, and the

26   Court will now address the merits of this claim.

27             For the purposes of review under 28 U.S.C.  § 2254(d)(1), it is clearly established

28   that "[a] gross proportionality principle is applicable to sentences for terms of years."

1   Lockyer v. Andrade, 538 U.S. 63, 72 (2003).  But the precise contours of the principle are

2   unclear, and "applicable only in the 'exceedingly rare' and 'extreme' cases." Id. at 73

3   (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991)).  "[T]he principle reserves a

4   constitutional violation for only the extraordinary case." Id. at 76.  A criminal sentence

5   proportionate to the crime for which the defendant was convicted does not violate the

6   Eighth Amendment.  See Solem v. Helm, 463 U.S. 277, 303 (1983) (sentence of life

7   imprisonment without possibility of parole for seventh nonviolent felony violates 8th

8   Amendment).  "Successful challenges to the proportionality of particular sentences will

9   be exceedingly rare." Id. at 289-90.  Since Harmelin, 501 U.S. 957, only extreme

10  sentences that are "grossly disproportionate" to the crime violate the Eighth Amendment.

11  United States v. Carr, 56 F.3d 38, 39 (9th Cir. 1995).

12       Here, petitioner was sentenced to 25 years to life in state prison for the current

13  offense of receiving stolen property and for the prior convictions for robbery and assault.

14  Longer sentences than petitioner's for less serious crimes than those of which petitioner

15  was convicted have been held to not be "grossly disproportionate" under the Eighth

16  Amendment.  See, e.g., Ewing v. California, 538 U.S.11, 24-25 (2003) (sentence of 25

17  years to life for conviction of grand theft with prior convictions was not grossly

18  disproportionate); Harmelin, 501 U.S. at 1005 (mandatory sentence of life without

19  possibility of parole for first offense of possession of 672 grams of cocaine did not raise

20  inference of gross disproportionality); Rummel v. Estelle, 445 U.S. 263, 284-85 (1980)

21  (upholding life sentence with possibility of parole for recidivist convicted of fraudulent

22  use of credit card for $80, passing forged check for $28.36 and obtaining $120.75 under

23  false pretenses); Taylor v. Lewis, 460 F.3d 1093, 1101-02 (9th Cir. 2006) (upholding

24  sentence of twenty-five years-to-life for possession of .036 grams of cocaine base where

25  petitioner served multiple prior prison terms and his prior offenses involved violence and

26  crimes against a person); Alford v. Rolfs, 867 F.2d 1216, 1221-23 (9th Cir. 1989)

27  (upholding life sentence with possibility of parole for possession of stolen property worth

28  $17,000 and having three prior non-violent convictions, including possession of a

1    controlled substance and forgery).  In light of this authority, petitioner's sentence does not

2    violate the Eighth Amendment's prohibition against cruel and unusual punishment so as

3    to warrant habeas relief.  Accordingly, petitioner's claim is DENIED.

4        **6 – 7.  <u>Improper sentence enhancement in using a prior convictions as strikes</u>**

5            Petitioner's sixth and seventh claims challenge the constitutionality of two

6    prior convictions that were counted as strikes under California's Three Strikes law,

7    resulting in a sentence of twenty-five years to life in state prison.

8        a.    **<u>The 1980 Robbery Conviction</u>**

9            Petitioner pled guilty to one count of robbery on January 30, 1980.

10   Petitioner now challenges the validity of the robbery conviction on the ground that he was

11   not advised of his constitutional right to counsel for all stages of his case.  Petitioner

12   claims that he retained counsel only for pre-trial purposes and was unaware that the court

13   would appoint him counsel if he could not longer afford one.  Petitioner claims that he

14   would not have entered a guilty plea had he known counsel would have been provided to

15   him if he had decided to go to trial.

16       b.    **<u>The 1981 assault conviction</u>**

17           Petitioner, represented by a public defender, pled guilty to one count

18   of assault with great bodily injury on July 29, 1981.  Petitioner now challenges the

19   validity of the assault conviction on the ground that his plea was not voluntary and

20   intelligent.  Petitioner states that his rights under <u>Boykin</u> and <u>Tahl</u> were never

21   enumerated, explained and waived.[5]  Petitioner argues that had he been informed of his

22   rights, he would not have entered a guilty plea to the great bodily injury allegation

23   attached to the assault charge.

24           The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which

25

26   ───────────────

27       [5] The United States Supreme Court in <u>Boykin v. Alabama</u>, 395 U.S. 238 (1969), and the
     California Supreme Court in <u>In re Tahl</u>, 1 Cal. 3d 122 (1969), held that prior to accepting a guilty

28   plea, a trial court must advice a defendant of his constitutional rights and obtain a waive of those
     rights.

1    became law on April 24, 1996, imposed for the first time a statute of limitations on

2    petitions for a writ of habeas corpus filed by state prisoners.  Petitions filed by prisoners

3    challenging non-capital state convictions or sentences must be filed within one year of the

4    latest of the date on which:  (A) the judgment became final after the conclusion of direct

5    review or the time passed for seeking direct review; (B) an impediment to filing an

6    application created by unconstitutional state action was removed, if such action prevented

7    petitioner from filing; (C) the constitutional right asserted was recognized by the Supreme

8    Court, if the right was newly recognized by the Supreme Court and made retroactive to

9    cases on collateral review; or (D) the factual predicate of the claim could have been

10   discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1).  Time during

11   which a properly filed application for state post-conviction or other collateral review is

12   pending is excluded from the one-year time limit.  Id. § 2244(d)(2).  AEDPA's one-year

13   time limit did not begin to run against any state prisoner before the date of the Act's

14   enactment.  See Calderon v. United States District Court (Beeler), 128 F.3d 1283, 1287

15   (9th Cir. 1997).  A prisoner with a state conviction finalized before April 24, 1996,

16   therefore had until April 24, 1997, to file a federal habeas petition on time.  Patterson v.

17   Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001).

18        Petitioner was convicted on the robbery charge on January 30, 1980, and on the

19   assault charge on July 29, 1981.  There is no evidence that petitioner directly appealed

20   these convictions, and his ability to do so has long since passed.  See Cal. R. of Ct.

21   30.1(a) ("Unless otherwise provided by law, a notice of appeal must be filed within 60

22   days after the rendition of the judgment or the making of the order being appeal.")

23        Since the prior convictions became final before AEDPA went into effect,

24   petitioner had until April 24, 1997, to file a timely federal habeas petition challenging

25   either conviction.  See Patterson, 251 F.3d at 1246.  Petitioner did not file a federal

26   habeas petition challenging either conviction, and neither has he presented any reason

27   why equitable tolling should apply to allow him to do so now.  Thus, under AEDPA,

28   petitioner is time barred from collaterally challenging the constitutionality of his prior

1  convictions.

2      Once a state conviction is no longer open to direct or collateral attack in its own

3  right because the defendant failed to pursue those remedies while they were available (or

4  because the defendant did so unsuccessfully), the conviction may be regarded as

5  conclusively valid.  If that conviction is later used to enhance a criminal sentence, the

6  defendant generally may not challenge the enhanced sentence through a petition under §

7  2254 on the ground that the prior conviction was unconstitutionally obtained, such as in

8  violation of due process as petitioner claims in the instant petition.  Lackawanna County

9  Dist. Attorney v. Coss, 532 U.S. 394, 403-04 (2001).

10     Exceptions to this provision occur only if there was a failure to appoint counsel in

11 violation of the Sixth Amendment or the state court refused to rule on a properly

12 presented constitutional claim.  Id. at 404, 405-06.  Petitioner's claims do not fall within

13 either exception.  Accordingly, the state court's decision denying these claims was not

14 contrary to or an unreasonable application of clearly established Supreme Court

15 precedent.  See 28 U.S. § 2254(d).  Petitioner's claims are without merit and are

16 DENIED.

17                          **III. CONCLUSION**

18     The court finds that petitioner has failed to show any violation of his federal

19 constitutional rights in the underlying state criminal proceedings.  Accordingly, the

20 petition for a writ of habeas corpus is denied.  The clerk shall enter judgment and close

21 the file.

22     IT IS SO ORDERED.

23 DATED: _____3/26/08_____          _Ronald M. Whyte_____

24                                        RONALD M. WHYTE
                                          United States District Judge

25

26

27

28